IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LONNIE J. RYAN, JR.,

                          Plaintiff,

v.

DAVID DAVIES, et al.,

                          Defendants.

Case No. 24-3154-DDC-ADM

## MEMORANDUM AND ORDER

Pro se plaintiff Lonnie J. Ryan, Jr. has been civilly confined under the Kansas Sexually Violent Predator Act (KSVPA) for longer than 20 years. During his confinement, he has moved through different phases of treatment—progressing from secure confinement, to transitional release, and most recently, conditional release. But, in April 2024, he violated the terms of his conditional release and so, he returned to the secure confinement facility at Larned State Hospital. In light of that return, Mr. Ryan brings this action under 42 U.S.C. § 1983, asserting that defendants violated his Fourteenth Amendment due-process and equal-protection rights and his constitutional right to freedom from restraint. Defendants David Davies, Assistant Attorney General for the State of Kansas; Laura Howard, Secretary of the Kansas Department for Aging and Disability Services (KDADS); Dr. Christine Mohr, Clinical Director of the Sexually Violent Predators Treatment Program; Todd Mantel, Conditional Release Monitor; and the Honorable Judge Gossard filed a Motion to Dismiss (Doc. 15). Mr. Ryan also filed a Motion for Default Judgment (Doc. 17). The court resolves both motions here.

The court holds, *first*, that Judge Gossard is entitled to judicial immunity and dismisses him as a defendant.  *Then*, it dismisses all but one of Mr. Ryan's claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  One procedural-due-process claim survives.  *Finally*, this Order denies Mr. Ryan's default judgment motion.  The court recites the background facts, below.  But first, it provides a brief overview of civil commitment under the KSVPA.

## I.    Kansas Sexually Violent Predator Act

The KSVPA was enacted to serve two purposes:  "to address the special needs of sexually violent predators" with "control, care and treatment" and to protect society from the "risks" and "dangers they present."  Kan. Stat. Ann. § 59-29a01(a).  It defines a sexually violent predator as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence and who has serious difficulty in controlling such person's dangerous behavior."  *Id.* § 59-29a02(a).  Commitment requires that "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others."  *Id.* § 59-29a02(c).

Once committed under the KSVPA, an individual remains in custody "until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large."  *Id.* 59-29a07(a).  While in custody, that individual progresses through three tiers of inpatient services—or secure commitment—and then two levels of supervised treatment: transitional release and conditional release.  *Merryfield v. State*, No. 23-3066-JWB, 2024 WL 2818139, at *1 (D. Kan. June 3, 2024), *vacated in part on reconsideration*, No. 23-3066-JWB, 2024 WL 4751397 (D. Kan. Nov. 12, 2024), *aff'd*, No. 24-3189, 2025 WL 2528517 (10th Cir. Sept. 3, 2025).  The statute requires a yearly review of each committed person's mental

condition, after which the person may request an annual review hearing.  Kan. Stat. Ann. § 59-20a08(a)–(b).

### Transitional Release

To move from inpatient services to transitional release, a committed person must secure a transitional release hearing in one of two ways.  *First*, the person may show "probable cause to believe the person's mental abnormality or personality disorder has significantly changed so that the person is safe to be placed in transitional release" at an annual review hearing.  *Id.* § 59-29a08(d).  *Alternatively*, the KDADS secretary may determine the same and authorize the person to petition the court for transitional release.  *Id.* § 59-29a10(a)(1).  At the transitional release hearing, the burden shifts to the state "to prove beyond a reasonable doubt that the person's mental abnormality or personality disorder remains such that the person is not safe to be placed in transitional release and if transitionally released is likely to engage in repeat acts of sexual violence."  *Id.* § 59-29a08(g).  Once in transitional release, a person is eligible to petition for conditional release, which proceeds through the same hearing process.  *Id.* §§ 59-29a08(b), 59-29a18.

### Conditional Release

A person eligible for conditional release must accept a treatment plan established by the court.  *Id.* § 59-29a19(a).  If the person violates the plan—as determined by a conditional release monitor—the monitor may request that the court issue an emergency ex parte order to return the person to the secure commitment facility.  *Id.* § 59-29a19(b).  The court then must set a hearing where the state has "the burden of proof to show probable cause that the person violated conditions of conditional release."  *Id.* § 59-29a19(d).  After the hearing, the court orders the person to the secure commitment facility, transitional release, or conditional release.  *Id.*  To

qualify for a full discharge, the person must not violate the treatment plan's conditions for a minimum of five years. *Id.* § 59-29a19(e).

With that statutory context, the court recites the background facts governing the current motions, next.

## II.    Background

The following facts come from the Complaint (Doc. 1) and from judicially noticed court documents attached to defendants' Motion to Dismiss.[1]  The court accepts Mr. Ryan's "well-pleaded facts as true, view[s] them in the light most favorable to [him], and draw[s] all reasonable inferences from the facts" in his favor. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).  But "factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (quotation cleaned up).

### *Mr. Ryan's Commitment under the KSVPA*

In 1999, Mr. Ryan was charged with and convicted of indecent liberties with a minor and sentenced to 52 months in prison.  Doc. 1 at 4 (Compl. ¶ C.2.A).  In 2001, when Mr. Ryan was

---

[1]      In considering defendants' motion, the court can consider documents subject to judicial notice. Defendants attach state court documents to their Motion to Dismiss (Doc. 15).  Though it evaluates material outside of the Complaint, the court properly can take judicial notice of these proceedings and avoid converting the motion to dismiss into one seeking summary judgment.  *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.").

"In ruling on a motion to dismiss, a federal court may take judicial notice of another court's publicly filed records if they have a direct relation to matters at issue." *Bruce v. City and County of Denver*, 57 F.4th 738, 741 n.3 (10th Cir. 2023) (citation omitted).  "However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Id.* (quotation cleaned up).  The court thus judicially notices Docs. 15-1, 15-2, 15-3, 15-4, 15-5, 15-6, 15-7 and 15-8. Mr. Ryan never disputes the accuracy of these documents. *See generally* Doc. 18.

eligible for release from prison, the State of Kansas moved to commit him under the KSVPA. *Id.* (Compl. ¶ C.2.B). In 2002, the Montgomery County, Kansas District Court found Mr. Ryan suffered from pedophilia—a mental abnormality—and committed him under the KSVPA. *Id.* (Compl. ¶ C.2.C).

### *Mr. Ryan's Transitional Release*

In July 2020, the Montgomery County Court moved Mr. Ryan to transitional release. *Id.* at 5 (Compl. ¶ C.2.G). The Complaint and the judicially noticed state court documents recount that move differently, however. According to the Complaint, the Montgomery County Court found Mr. Ryan's "mental abnormality or personality disorder reduced or . . . eliminated to the point that Mr. Ryan was safe to be released." *Id.* (Compl. ¶ C.2.H). But the undisputed court documents suggest a more nuanced holding. For starters, the state's Response to Mr. Ryan's transitional-release petition expressed reservation. It clarified that the Progress Review Panel considered Mr. Ryan "not completely free of risk due to the nature of his mental abnormality/personality disorder." Doc. 15-3 at 2 (Def. Ex. C). Instead, the reviewers characterized his mental abnormality "significantly mitigated so he appear[ed] safe *to be placed on Transitional Release*." *Id.* (emphasis added). And Montgomery County, Kansas District Court Judge Jeffrey D. Gossard similarly qualified his conclusion with limiting language. He explained that the court was "convinced beyond a reasonable doubt that [Mr. Ryan's] mental abnormality or personality disorder ha[d] so changed that [Mr. Ryan was] safe *to be placed in transitional release*." Doc. 15-4 at 5 (Def. Ex. D) (emphasis added). No state court document suggested Mr. Ryan "was safe to be released" fully, as the Complaint alleges. Doc. 1 at 5 (Compl. ¶ C.2.H); *see generally* Doc. 15-3.

### *Mr. Ryan's Conditional Release*

In December 2021, Judge Gossard placed Mr. Ryan on conditional release. Doc. 1 at 5 (Compl. ¶ C.2.J). Once again, the Complaint and the state court documents attached to defendants' dismissal motion employ different language to justify that conditional release placement. The Complaint asserts that the "Montgomery County Court found beyond a reasonable doubt that [Mr. Ryan's] mental abnormality or personality disorder [was] reduced or was eliminated to the point that Mr. Ryan was safe to be released." *Id.* (Compl. ¶ C.2.K). But the state court recited the findings a bit differently, qualifying Mr. Ryan's "safe" status with limiting language. It explained that the review panel had concluded that Mr. Ryan's "mental abnormality or personality disorder ha[d] changed sufficiently so that it would be *safe to be placed in Conditional Release*." Doc. 15-5 at 2 (Def. Ex. E) (emphasis added). The state court, for its part, simply held that it was "convinced beyond a reasonable doubt that [Mr. Ryan was] appropriate for Conditional Release and determine[d] that [Mr. Ryan] should be placed on Conditional Release." *Id.* at 2–3. At no time did the court declare Mr. Ryan safe for full discharge or unconditional release. *See generally id.*

### *Violation and Return to Secure Confinement Facility*

As part of his conditional release, Mr. Ryan signed a Conditional Release Agreement that outlined the terms and conditions of his conditional release plan. Doc. 15-6 (Def. Ex. F). In April 2024, Mr. Ryan's conditional release monitor reported by sworn affidavit to the court that Mr. Ryan "ha[d] violated material conditions of [his] treatment plan[.]" Doc. 15-7 at 2–3 (Def. Ex. G). So, Judge Gossard issued an emergency ex parte order authorizing law enforcement to take Mr. Ryan into custody and return him to the secure commitment facility at Larned State Hospital. *Id.* On April 26, 2024, Mr. Ryan was returned to the secure confinement facility. Doc. 1 at 5 (Compl. ¶ C.2.M).

After his return, on May 20, 2024, the Montgomery County Court held a hearing about Mr. Ryan's status.  *Id.* at 6 (Compl. ¶ C.2.Q); Doc. 15-8 at 2–3 (Def. Ex. H).  At the hearing, Mr. Ryan stipulated that he had violated specified rules of his Conditional Release Agreement.  Doc. 15-8 at 3 (Def. Ex. H).  Specifically, he stipulated that "he [had] engaged in sexual activities with two individuals who were peers in the Sexual Predator Treatment Program and members of his support group[.]"  *Id.*  He also stipulated that he had "failed to disclose the nature of the relations to the Conditional Release Monitor, therapist or any other member of his treatment team . . . until he was confronted."  *Id.*

According to the Complaint, Judge Gossard then "found that Mr. Ryan should be confined for the rule violation."  Doc. 1 at 6 (Compl. ¶ C.2.R).  Again, though, the court documents reveal a more nuanced holding:

> The court finds that the Sexual Predator Treatment Program is progressive by design with skills learned, then demonstrated in behavior.  [Mr. Ryan], while engaging in sexual acts, failing to disclose his behavior and relationships indicate[d] the absence of skills [he] needs to be safe in the community.  [Mr. Ryan] has shown that[,] while engaging in behavior that violates the conditions of his release[,] he was dishonest with his Conditional Release Monitor and therapist, which indicates his lack of interest in therapy, lack of desire to be successful, and lack of remorse for his behavior and dishonesty.  These factors along with the results of the actuarial instrument indicate [Mr. Ryan] poses a high degree of risk in the community.  The court finds that it is in the best interests of [Mr. Ryan] and the community that he be returned to the secure care facility, to gain the skills needed to live safely in the community.

Doc. 15-8 at 3 (Def. Ex. H).  Based on these findings, Judge Gossard ordered Mr. Ryan returned to the secure commitment facility at Larned State Hospital.  *Id.* at 3–4.

## III.     Legal Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  For a complaint to survive a Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' the complaint fails to state a claim." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Finally, and crucial to the analysis applied here, "factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true." *Matney*, 80 F.4th at 1145 (quotation cleaned up).

Because Mr. Ryan appears pro se, the court construes his pleadings liberally and holds them to a less stringent standard than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  But this rule of construction doesn't authorize the court to assume the role of his advocate. *Hall*, 935 F.2d at 1110.  And Mr. Ryan's pro se status doesn't excuse him from "the burden of alleging

sufficient facts on which a recognized legal claim could be based." *Id.*  Simply put, the court

can't "supply additional factual allegations to round out [the pro se litigant's] complaint or

construct a legal theory on [his] behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th

Cir. 1997).

The court evaluates defendants' Motion to Dismiss (Doc. 15), below.  It starts with

defendants' immunity arguments.  Then, it turns to the heart of the dismissal motion—whether

Mr. Ryan has failed to state a claim.

## IV.        Immunity

Defendants' motion asserts that various forms of immunity apply to preclude Mr. Ryan's

claims.  Doc. 15 at 8–14.  They contend that judicial immunity protects Judge Gossard,

prosecutorial immunity protects Assistant Attorney General Davies, and qualified immunity

protects defendants Howard, Mohr, and Mantel from suit.  *Id.*  But Mr. Ryan's Response clarifies

that he asserts only official capacity claims against defendants—not personal capacity claims.

Doc. 18 at 11.  And that clarification has implications for defendants' immunity arguments.

Namely, qualified and prosecutorial immunity don't apply to official capacity claims.  *See Cox v.

Glanz*, 800 F.3d 1231, 1239 n.1 (10th Cir. 2015) ("The defense of qualified immunity is

available only in suits against officials sued in their personal capacities, not in suits against

officials sued in their official capacities." (quotation cleaned up)); *see also Earle E. v. W. Valley

City Police Dep't*, No. 18-cv-00438-DB-EJF, 2019 WL 653286, at *5 (D. Utah Jan. 23, 2019)

("While absolute prosecutorial immunity protects the County Defendants in their individual

capacities, it does not protect them in their official capacities." (citing *Kentucky v. Graham*, 473

U.S. 159, 167 (1985)), *report and recommendation adopted*, 2019 WL 652298 (D. Utah Feb. 15,

2019); *Clay v. Smith*, No. CIV-08-85-W, 2008 WL 3927124, at *5 n.11 (W.D. Okla. Aug. 26,

2008) ("But prosecutorial immunity would not cover the official capacity claims." (citing *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466–67 (5th Cir. 1999))).[2]

But judicial immunity persists as a viable argument, even with strictly official capacity claims asserted. *See Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007) ("'Judicial immunity' is shorthand for the doctrine of absolute immunity that operates to protect judges and quasi-judicial officers alike from suit in both their official and individual capacities."); *see also McDonald v. Citibank N.A.*, No. 21-cv-00427-PAB-NRN, 2021 WL 5736437, at *4 (D. Colo. Dec. 2, 2021) ("Absolute judicial immunity applies to all claims, whether official-capacity or personal-capacity, that are based on judicial acts.") (collecting cases). Indeed, the parties here agree: judicial immunity precludes Mr. Ryan's claims against Judge Gossard. *See* Doc. 15 at 10–11; Doc. 18 at 2.

"A defense of absolute judicial immunity is analyzed under Federal Rule of Civil Procedure 12(b)(6)." *Aragon v. Vander Dussen*, No. 23-cv-00674-MIS-KRS, 2023 WL 8602874, at *3 (D.N.M. Dec. 12, 2023) (citing *Guiden v. Morrow*, 92 F. App'x 663, 666 n.10 (10th Cir. 2004)). Generally, judges are immune from suits for money damages and injunctive relief. *Mireles v. Waco*, 502 U.S. 9, 9 (1991) (per curiam); *see also Lawrence v. Kuenhold*, 271

---

[2]    Mr. Ryan's official-capacity-claims-only clarification also has implications for defendants' personal participation argument. Defendants contend that Mr. Ryan has failed to allege the requisite personal participation for his claims against defendants Howard, Mohr, and Mantel. Doc. 15 at 13 ("No facts explain how Howard, Mohr and/or Mantel were personally involved in Ryan's activity."). But only individual capacity claims require allegations of personal participation. *See Miskovsky v. Jones*, 559 F. App'x 673, 676 (10th Cir. 2014) (affirming and agreeing fully where district court relegated personal participation requirement to individual capacity claims); *Spiess v. Fricke*, 386 F. Supp. 2d 1178, 1191 (D. Kan. 2005) ("[Defendant's] lack of personal involvement in any retaliation is irrelevant because this is an official capacity claim essentially against the State."); *Clark v. Bartling*, No. CIV-08-05-C, 2009 WL 112985, at *7 (W.D. Okla. Jan. 15, 2009) ("[Defendant's] lack of personal participation would not affect the official capacity claim."); *Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Because Mr. Ryan brings only official capacity claims, the court doesn't address defendants' personal participation argument.

F. App'x 763, 766 n.6 (10th Cir. 2008) (explaining that after Congress amended 42 U.S.C.

§ 1983, "the doctrine of judicial immunity now extends to suits against judges where a plaintiff

seeks not only monetary relief, but injunctive relief as well"). Only two exceptions to judicial

immunity exist: (1) "a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not

taken in the judge's judicial capacity;" and (2) "a judge is not immune for actions, though

judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11–12

(citations omitted).

Defendants argue that the Complaint asserts no facts capable of supporting either judicial

immunity exception here. Doc. 15 at 10–11. In response, Mr. Ryan agrees. Doc. 18 at 2. To

his credit, he concedes that "immunity as presented by the Defendant(s)" applies. *Id.* And he

asks the court to dismiss Judge Gossard as a defendant. *Id.* There's one little wrinkle, however.

The Complaint initially identifies the "Honorable Roger L. Gossard" as a defendant. Doc. 1 at 3

(Compl. ¶ A.10). Part-way through, the Complaint switches to the "Honorable Jeffrey Gossard."

*Id.* at 6 (Compl. ¶ 2.C.R). Defendants' briefing exacerbates the mistaken-identity kerfuffle by

referring to a third name—the "Honorable Robert L. Gossard." *See* Doc. 15 at 1; Doc. 24 at 1.

But then defendants attached state court documents that identify Judge Jeffrey D. Gossard—not

Roger L. or Robert L.—as the judicial officer implicated by Mr. Ryan's Complaint. *See* Doc.

15-2 at 1; Doc. 15-4 at 6; Doc. 15-5 at 4; Doc. 15-7 at 1, 5, 9; Doc. 15-8 at 1, 4.

The court concludes it needn't devote any more judicial resources to pursue this identity

confusion, however. The parties agree—and the court concurs—that the Complaint doesn't

allege facts supporting an exception to judicial immunity for Judge Gossard, whatever his true

first name. So, the court dismisses Mr. Ryan's claims against Judge Gossard with prejudice. *See*

*Smith v. Arguello*, 415 F. App'x 57, 61 (10th Cir. 2011) (affirming district court's dismissal of

plaintiff's claims for several reasons including "the doctrine[] of judicial immunity" and concluding that "the district court properly entered the dismissal with prejudice"); *Ray v. Quisenberry*, No. CIV-22-823-D, 2023 WL 2447598, at *2, 3 (W.D. Okla. Mar. 10, 2023) (dismissing claims against state judge with prejudice based on judicial immunity), *aff'd*, No. 23-6038, 2023 WL 3634720 (10th Cir. May 25, 2023) (finding no error in district court's decision to dismiss with prejudice claims barred by absolute judicial immunity).

## V.    Failure to State a Claim

Defendants also argue that the Complaint fails to state a claim.  Defendants' arguments in this vein focus primarily on the inaccuracy of Mr. Ryan's factual assertions, as compared to the state-court-judicial records.  But before turning to those alleged factual inaccuracies—and evaluating how they affect Mr. Ryan's constitutional claims—the court briefly addresses Mr. Ryan's equal protection claim.

### A.    Equal Protection Claim

The Complaint mentions—just once—a Fourteenth Amendment equal protection claim. Doc. 1 at 4 (Compl. ¶ C.1.C).  But, as defendants identify, Mr. Ryan's Response failed to address defendants' arguments against his equal protection claim.  Doc. 24 at 1 (citing *Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015) (collecting cases supporting the proposition that failing to address opposing parties' argument in response or reply brief waives "any objections not obvious to the court" (quotation cleaned up))).  More conclusive still, the Complaint fails to allege the requisite elements to state an equal protection claim.

To begin, Mr. Ryan never alleges that he is a member of a suspect class.  *See generally* Doc. 1 (Compl.).  And the Tenth Circuit already has weighed in to clarify that under an "equal protection analysis, sex offenders are not a suspect class."  *Hines v. Addison*, 117 F. App'x 713, 715 (10th Cir. 2004).  This deficiency leaves just a class-of-one equal protection theory.  Such a

theory requires a plaintiff to establish, first, "that others similarly situated in every material respect were treated differently." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (quotation cleaned up). "A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was irrational and abusive, and wholly unrelated to any legitimate state activity." *Id.* (quotation cleaned up). But the Complaint, even liberally construed, never identifies similarly situated individuals, differential treatment, or irrational and abusive government behavior. Mr. Ryan's equal protection allegation—mentioned just once, Doc. 1 at 4 (Compl. ¶ C.1.C)—thus constitutes nothing more than a label or conclusion. That just won't do to state a claim, *Iqbal*, 556 U.S. at 678. The court dismisses this claim.

**B.    Claims Involving Factual Inaccuracies**

Defendants expend most of their dismissal efforts to argue that Mr. Ryan fails to state a claim because the factual assertions that inform his constitutional claims are inaccurate, as demonstrated by the state-court-judicial record. Doc. 15 at 5–8. The Complaint alleges that defendants violated Mr. Ryan's Fourteenth Amendment right to due process and his right to freedom from restraint. Doc. 1 at 4 (Compl. ¶ C.1.A–B). Defendants contend that Mr. Ryan premises all his constitutional violation theories on two inaccurately alleged facts. Doc. 15 at 5–8.

*First*, Mr. Ryan alleges that he was returned to secure confinement "for a rule violation rather than a mental abnormality that causes the person to be a danger[.]" Doc. 1 at 7 (Compl. ¶ E.1.1). But, defendants argue, the state court didn't return him to secure confinement solely for a rule violation. Instead, that rule violation indicated he wasn't yet safe to live in the community. So, the state court returned Mr. Ryan to secure confinement because he still posed a threat.

*Second*, Mr. Ryan alleges that the Montgomery County, Kansas District Court "found beyond a reasonable doubt that Mr. Ryan was no longer a danger[.]" *Id.* at 8 (Compl. ¶ E.1.5). But, defendants contend, no one ever deemed Mr. Ryan "safe to be at large"—*i.e.*, eligible for full release. Doc. 15 at 7 (quotation marks and internal citation omitted). Instead, the state court determined Mr. Ryan was safe *for transitional or conditional release*—meaning he remains committed for control, care, and treatment. *Id.*

In a nutshell, defendants argue that all of Mr. Ryan's remaining theories of constitutional violation rest on either his confined-solely-for-rule-violation or his already-deemed-safe assertion.[3] Defendants are right—mostly. Most, but not all, of Mr. Ryan's constitutional claims fail as factually unsupported. The court thus dismisses the claims relying on conclusory or inaccurate allegations—including his substantive- and procedural-due-process claims. But the court parses out one procedural-due-process claim that doesn't so rely—and that claim survives.

### 1.      Substantive Due Process

Mr. Ryan contends that returning him to secure confinement for a rule violation—not a mental abnormality—makes the KSVPA punitive and thus impermissible under the Fourteenth Amendment. Doc. 1 at 7 (Compl. ¶ E.1.1). Liberally construing the Complaint—as it must—the court interprets this theory to state both a substantive-due-process and a procedural-due-process claim. The court takes up the substantive-due-process claim first.

Mr. Ryan's substantive-due-process claim invokes his protected liberty interest in freedom from bodily restraint. And it flows from Mr. Ryan's assertion that the KSVPA—in the

---

[3]     Mr. Ryan also asserts that conduct by Gary House, his appointed defense attorney, violated his right to an adversarial testing process and denied him due-process-procedural protections in violation of the Fourteenth Amendment. Doc. 1 at 7 (Compl. ¶ E.1.3–4). But the court already dismissed Mr. House because he wasn't a state actor when performing a lawyer's traditional functions *See* Doc. 9 at 5–6 (citing *Polk County v. Dodson*, 454 U.S. 312, 325 (1981)).

transitional and conditional release stages—is punitive.  The court determines this substantive-due-process claim fails.  As explained below, Supreme Court precedent precludes a finding that the KSVPA is punitive where the facts indicate the state court had no retributive or deterrent purposes in returning Mr. Ryan to secure confinement.

"The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.  Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (quotation cleaned up).  But this liberty interest isn't absolute. *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997).  And the United States Supreme Court has long recognized that involuntary civil commitment—such as that which occurs under the KSVPA—isn't "contrary . . . to ordered liberty" provided that specified conditions are met. *Id.* at 357.  One of those conditions requires that the civil commitment doesn't serve a punitive purpose. *Id.* at 361–69.  So, the question asked here is whether the facts of Mr. Ryan's return to Larned State Hospital demonstrate that the state was punishing Mr. Ryan for violating the rules.

*Kansas v. Hendricks* governs this substantive-due-process analysis.  In *Hendricks*, the United States Supreme Court upheld the constitutionality of the KSVPA.  521 U.S. 346.  In doing so, it considered whether the KSVPA was punitive in nature. *Id.* at 361–69.  The Court explained that a civil commitment statute which implicates either retribution or deterrence—the "two primary objectives of criminal punishment"—is constitutionally suspect. *Id.* at 361–62.  Then, it looked at whether the KSVPA implicated the retributive purpose of criminal punishment. *Id.* at 362.  To answer this query, the Court homed in on *how* the KSVPA used an individual's prior criminal conduct.  The Court concluded that the KSVPA uses that prior

15

conduct "solely for evidentiary purposes, either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." *Id.* When used in that fashion, such evidence is "received not to punish past misdeeds, but primarily to show the accused's mental condition and to predict future behavior." *Id.* (quotation cleaned up).

The Court also concluded that the KSVPA can't fulfill the deterrent objective of criminal justice because persons under the KSVPA—by definition—can't "exercise[e] adequate control over their behavior." *Id.* at 362–63. So, sexually violent predators are "unlikely to be deterred by the threat of confinement." *Id.* Instead of exacting retribution or securing deterrence, the Court concluded, a commitment under the KSVPA serves "to hold the person until his mental abnormality no longer causes him to be a threat to others"—which is a "legitimate nonpunitive government objective[.]" *Id.* at 363.

Applying *Hendricks*'s reasoning here, had a court used Mr. Ryan's rule violation to achieve retribution or deter future violations, then his return to secure confinement would prove constitutionally troubling. If, on the other hand, his return just served to hold him until he's no longer a threat, that's constitutionally permissible. The facts here indicate that it was the latter. Although Mr. Ryan alleges that his return to Larned State Hospital was punitive, that's not what the judicially noticed court documents reveal.

Recall that Mr. Ryan stipulated to violating the terms of his Conditional Release Agreement by engaging in sexual activities with others in the Sexual Predator Treatment Program and failing to report those activities. Doc. 15-8 at 3 (Def. Ex. H). The state court interpreted his behavior as indicative of "the absence of skills [Mr. Ryan] needs to be safe in the community[,]" a "lack of interest in therapy," and a "lack of desire to be successful[.]" *Id.* It concluded, based on that evidence, that Mr. Ryan didn't possess "the skills needed to live safely

16

in the community." *Id.* The court's order thus expressly didn't return Mr. Ryan to Larned State Hospital to exact retribution or deter future violations. Instead, the state court evaluated the rule-violation evidence "to support a finding of future dangerousness." *Hendricks*, 521 U.S. at 362. That is, the state court determined that Mr. Ryan's behavior of violating his agreement predicted future unsafe behavior. And the Supreme Court has deemed such an approach to prior conduct both permissible and nonpunitive. *Id.*

In short, the state court endeavored "to hold [Mr. Ryan] until his mental abnormality no longer causes him to be a threat to others." *Id.* at 363. And the Supreme Court has adjudged such an endeavor "a legitimate nonpunitive governmental objective[.]" *Id.* As *Hendricks* explained, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *Id.* (internal quotation marks and citation omitted).

The judicially noticed documents establish that the court returned Mr. Ryan to secure confinement for a nonpunitive objective. So, the substantive-due-process prong of Mr. Ryan's Fourteenth Amendment challenge fails to state a claim under the record facts.

But Mr. Ryan's rule-violation allegation, liberally construed, has a procedural-due-process component to it as well. He alleges that return to secure confinement—absent a finding of mental abnormality (or personality disorder)—violates his right to freedom from restraint. Doc. 1 at 4, 7 (Compl. ¶¶ C.1.B, E.1.1). So, he challenges the absence of a mental-abnormality finding when returning him to secure confinement. Several of his other constitutional violation theories also revolve around the requisite mental-abnormality finding to justify civil commitment. The court takes up these requisite-finding arguments, next, under a procedural-due-process framework.

### C.    Procedural Due Process

The KSVPA is sound constitutionally only when a finding of mental abnormality or personality disorder precedes civil commitment. In *Hendricks*, the Supreme Court emphasized the importance of the KSVPA's mental abnormality or personality disorder "precommitment requirement[.]" 521 U.S. at 358. It concluded that such a requirement "narrow[ed] the class of persons eligible for confinement to those who are unable to control their dangerousness." *Id.* And that narrowing proved crucial "to justify indefinite involuntary commitment" because it "limit[ed] involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* In short, commitment requires a finding of mental abnormality alongside a finding of dangerousness. Indeed, the Supreme Court has held, a "finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. [The Court has] sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.*

Here, Mr. Ryan alleges that the requisite mental-abnormality finding was absent in two different ways. *First*, he alleges that the state court had found him no longer mentally abnormal but didn't release him or re-adjudicate his mental abnormality to justify his continued confinement. *Second*, he asserts, the court used his rule violation as a proxy for a mental abnormality finding when returning him to secure confinement. These arguments about a requisite mental-abnormality finding implicate procedural due process.

Our Circuit has explained that "'[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment.'" *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). A

18

procedural-due-process claim requires a two-step inquiry:  (1) "whether the plaintiff had a constitutionally protected interest[,]" and (2) "whether the process afforded was adequate to protect that interest."  *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 (10th Cir. 2013) (citation omitted).

The court construes Mr. Ryan's allegations to challenge the process afforded him when removing his liberty interest in a freedom from restraint.  Mr. Ryan alleges the requisite mental-abnormality finding was absent to support his continuing confinement.  To be sure, he never contests that the state court found he suffered from a mental abnormality—pedophilia—in 2002.  Doc. 1 at 4 (Compl. ¶ C.2.C).  But Mr. Ryan asserts two theories to establish a procedural-due-process problem since his initial commitment—one holds water, one doesn't.  Start with the one that doesn't.

### a.    No Longer a Danger

Mr. Ryan theorizes that the state court has concluded that he no longer has a mental abnormality.  To support this theory, he repeatedly asserts that the court has declared him safe.  *See, e.g.*, *id.* at 8 (Compl. ¶ E.1.5).  When the state court placed him on transitional and conditional release, Mr. Ryan alleges, it "found beyond a reasonable doubt that the mental abnormality no longer caused him to be a danger[.]"  *Id.* at 6 (Compl. ¶¶ C.2.X, Y).

Premised on this purported "no longer a danger" finding, Mr. Ryan asserts two theories for why his continued confinement is constitutionally suspect:  *One*, he asserts that the court— after it purportedly found him no longer a danger—was required to discharge him fully.  But it didn't.  *Id.* at 8 (Compl. ¶ E.1.6).  A hearing which doesn't release a safe person on full discharge is unconstitutional, he alleges.  *See id.* at 7 (Compl. ¶ E.1.2).  Given his no-longer-a-danger status, the court couldn't continue to confine him under the KSVPA without violating the Constitution.  *Id.* at 8 (Compl. ¶ E.1.5).  *Second*, Mr. Ryan asserts that the court couldn't "re-

confine" him "once . . . released" without a full hearing involving specified protections like those provided at initial commitment. *Id.* (Compl. ¶ E.1.7).

Defendants cry foul. They argue that the state court never determined Mr. Ryan was fit for full release—only transitional or conditional release. Doc. 15 at 7–8. And, they contend, the judicially noticed state court records demonstrate as much. Defendants argue that the state court records show that all alleged "safe" findings were qualified—*i.e.*, Mr. Ryan was "safe to be placed" in transitional or conditional release. *See* Doc. 15-3 at 2 (Def. Ex. C); Doc. 15-4 at 5 (Def. Ex. D); Doc. 15-5 at 2 (Def. Ex. E). What's more, when recommending Mr. Ryan for transitional release, the Progress Review Board specifically identified continuing mental abnormality. Doc. 15-3 at 2 (Def. Ex. C) ("Mr. Ryan is not completely free of risk due to the nature of his mental abnormality/personality disorder."). Defendants thus contend that no one ever declared Mr. Ryan safe for full discharge or unconditional release. Their brief sums it up this way: "The [state] Court's finding [that Mr.] Ryan was 'safe' to proceed to advancing phases of treatment is not analogous to being discharged from the program. His commitment, determined by the [state] Court in 2002, continues until such a finding." Doc. 24 at 4 (citations omitted). So, defendants argue, Mr. Ryan's various and sundry constitutional violation theories premised on his "no longer a danger" assertion fail.

Defendants have the better of this dispute. The state court documents attached to defendants' Motion to Dismiss (Doc. 15) definitively show that the state court never declared Mr. Ryan safe for full discharge. The court always qualified any "safe" finding with limiting language: "safe to be placed" in a specified form of release. *See* Doc. 15-4 at 5 (Def. Ex. D); Doc. 15-5 at 2 (Def. Ex. E). And this dooms Mr. Ryan's theories of relief premised on the court having deemed him "no longer a danger." Namely, Mr. Ryan's theory that the court should have

20

released him on full discharge—rather than continuing to confine him—and his theory that the court re-confined him without specified protections lack a factual basis. Because the state court never deemed him fully safe, these theories fail to state a claim. And the court grants defendants' motion and dismisses these claims.

Separately, when Mr. Ryan alleges that his continued confinement under the KSVPA is unconstitutional—given his alleged no-longer-a-danger status—he appears to challenge the fact of his confinement. Doc. 1 at 8 (Compl. ¶ E.1.5). But a committed person must challenge the fact of his confinement with a habeas action, not a § 1983 claim. *See Boutwell v. Keating*, 399 F.3d 1203, 1209 (10th Cir. 2005) ("[H]abeas corpus is the only avenue for a challenge to the *fact* or *duration* of confinement, at least when the remedy requested would result in the prisoner's immediate or speedier release from that confinement." (emphasis in original)); *see also Hemby v. Howard*, No. 25-3071-JWL, 2025 WL 1489142, at *4 (D. Kan. May 23, 2025) (applying principle that fact of confinement requires habeas action in context of Section 1983 suit by civilly-committed plaintiff challenging KSVPA); *Dwerlkotte v. Mitchell*, No. 21-3264-DDC-KGG, 2022 WL 2340845, at *3 (D. Kan. June 29, 2022) (same). So, to the extent Mr. Ryan challenges his confinement itself and seeks release from confinement, his claims also fail for that alternative reason.

One procedural-due-process claim survives, however.

### b.    Rule Violations and Mental Abnormality

One of Mr. Ryan's procedural-due-process claims doesn't rely on the state court having found him "no longer a danger." Mr. Ryan alleges that defendants improperly moved him back to the secure commitment facility "prior to any finding of the return of a mental abnormality or personality disorder that made him likely to commit another sexually violent offense." Doc. 1 at 5 (Compl. ¶ C.2.N). Mr. Ryan appears to argue that his release status indicated progress in his

mental-abnormality treatment. *See* Doc. 18 at 6. So, he questions whether the state should have to demonstrate mental abnormality—not just a rule violation—before demoting him back to secure confinement. Doc. 1 at 5 (Compl. ¶ C.2.N). Recall that Mr. Ryan stipulated to violating a rule by engaging in sexual relations with other adults in the same treatment program and failing to report those activities. Doc. 15-8 at 2–3 (Def. Ex. H). The state court interpreted that rule-breaking behavior to indicate that Mr. Ryan remains dangerous. *Id.* But it never linked the dangerousness finding to his mental abnormality. *See generally id.* So, Mr. Ryan appears to argue, to satisfy due process, the state court needed to link his rule violation to pedophilia. Succinctly, the state can't employ the rule violation as a proxy for a mental-abnormality finding.

The court construes Mr. Ryan's rule-violation-as-a-proxy argument to challenge the constitutionality of the KSVPA's transitional and conditional release provisions. Specifically, the claim challenges what the state must show to demote an individual who violates a release rule. As already outlined, the KSVPA provides for a demotion when an individual violates a term of release. Kan. Stat. Ann. § 59-29a19(d). To demote that individual, the state has "the burden of proof to show probable cause that the person violated conditions of conditional release." *Id.* With that showing, the court may order the person returned to the secure commitment facility, transitional release, or conditional release. *Id.* That's not right, Mr. Ryan seems to argue, because there's no requirement that the state establish a link between the rule violation and evidence of ongoing pedophilia.

Mr. Ryan also contends that *Hendricks* doesn't negate this claim because *Hendricks* reviewed the constitutionality of initial commitment scheme, not subsequent release procedures. Doc. 18 at 4. Indeed, *Hendricks* doesn't answer Mr. Ryan's procedural-due-process claim here. Not only did *Hendricks* focus on the initial commitment procedures, but it addressed substantive-

due-process claims against the KSVPA, not procedural ones.  521 U.S. 346.  And the Tenth

Circuit has acknowledged as much:  "In [*Hendricks*], the Supreme Court considered a challenge

to the constitutionality of the KSVPA and determined that the procedures and evidentiary

standards set forth in the statute satisfied substantive-due-process requirements such that the

statute was constitutional.  The Court did not consider a procedural-due-process claim[.]"

*Ellison v. Ladner*, 767 F. App'x 656, 662 n.8 (10th Cir. 2019) (internal citation omitted).  So,

Mr. Ryan's claim remains viable under *Hendricks*.  It also appears viable under other Supreme

Court precedent governing procedural due process during civil commitment.  The United States

Supreme Court has "recognized that civil commitment for any purpose constitutes a significant

deprivation of liberty that requires due process protection."  *Addington v. Texas*, 441 U.S. 418,

425 (1979).  And the Court only upholds "involuntary commitment statutes provided [that] the

confinement takes place pursuant to proper procedures and evidentiary standards."  *Hendricks*,

521 U.S. at 357.

      The proof required to demote an individual back to secure confinement under the

KSVPA implicates these due process protections.  It's not clear that simply proving a rule

violation constitutes sufficient process to justify the four-year demotion Mr. Ryan received.[4]

That's so because a finding of dangerousness alone doesn't suffice to justify initial commitment.

*Hendricks*, 521 U.S. at 358.  Instead, it must couple with proof of some additional factor, like a

mental abnormality.  *Id.*  To be sure, the state court interpreted Mr. Ryan's rule violation to

indicate he wasn't safe.  Doc. 15-8 at 3 (Def. Ex. H).  But it didn't couple that dangerousness

with pedophilia.  *See generally id.*  And violating a rule by failing to report sexual relations with

---

[4]      Mr. Ryan moved to transitional release in July 2020.  Doc. 1 at 5 (Compl. ¶ C.2.G).  He was
returned to secure confinement on April 26, 2024.  *Id.* (Compl. ¶ C.2.M).  So, his return to secure
confinement erased four years of progress in the treatment program.

another consenting adult in one's private residence isn't the same thing as being a pedophile. The dual commitment requirement—dangerousness *and* mental abnormality—opens the door for Mr. Ryan's claim.  He contends his rule violation needs a correlating mental-abnormality finding to justify returning him to secure confinement.  It's conceivable—absent some link between the rule violation and a mental abnormality—that the demotion procedures outlined by the KSVPA aren't sufficient to satisfy procedural due process.

In sum, the court can't dismiss Mr. Ryan's procedural-due-process claim premised on the state's burden of proving solely a rule violation to demote him—at least not at this stage of the case.  This claim alone survives.

## VI.        Default Judgment

Mr. Ryan also moves for a default judgment.  Doc. 17 at 2.  When he filed the default motion, Mr. Ryan had no knowledge that any defendant had filed an answer or responsive pleading.  *Id.*  So, Mr. Ryan argues, any subsequent responsive pleading was out-of-time.  *Id.* Defendants Davies, Howard, Mohn, Mantel, and Gossard responded, asserting that they timely filed their Motion to Dismiss (Doc. 15).  Doc. 21 at 1, 2.  They also argue that Mr. Ryan failed to comply with the requirements of a default judgment under Fed. R. Civ. P. 55.  *Id.* at 2.

Mr. Ryan accurately identifies that service issues and timeliness concerns abound in this case.  Here's why.  Defendants returned waivers of service on December 23, 2024.  *See* Doc. 11; Doc. 12; Doc. 13; Doc. 14.  But the Clerk of the Court had issued requests for those waivers on October 9, 2024—after District Judge John W. Lungstrum granted Mr. Ryan's in forma pauperis motion.  Doc. 9 at 6.  So, 75 days passed between the time when the court requested the waivers and when defendants returned them.  Fed. R. Civ. P. 4(d)(1)(F) provides that a plaintiff should "give the defendant a reasonable time of at least 30 days after the request was sent . . . to return the waiver[.]"  The 75-day span here far exceeds that suggested "reasonable" timeframe.  So, the

24

court should have interpreted this delay as defendants failing to waive service and should have ordered service at defendants' expense. *See* Fed. R. Civ. P. 4(d)(2) (explaining consequences court must impose on defendant for failing to sign and return waiver requested). 28 U.S.C. § 1915(d) provides that "officers of the court shall issue and serve all process" when a plaintiff is proceeding in forma pauperis. And Fed. R. Civ. P. 4(c)(3) specifies that the court must order a U.S. marshal, deputy marshal, or person specially appointed by the court to serve plaintiff's process "if the plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915[.]" So, it was the court's job to recognize the return-of-waiver delay and act accordingly. *See Abuhouran v. Acker*, No. Civ.A.04-2265, 2005 WL 1532496, at *3 (E.D. Pa. June 29, 2005) ("Once *in forma pauperis* status is granted, it becomes the district court's responsibility to serve process upon all defendants."); *Marshall v. Eadison*, No. Civ.A. 704CV123HL, 2005 WL 3132352, at *3 (M.D. Ga. Nov. 22, 2005) (finding when waiver of service period expired and "Marshals Service failed to attempt personal service" that "any delay in perfecting service was due to an inadvertent mistake by the Marshals Service"). But, before the court recognized the delay, defendants returned the waivers of service.

Further complicating the service and timeliness issues, defendants then improperly calculated the time allocated to file an answer or responsive pleading. Defendants, it appears, assumed they had 60 days from the date when they returned their waivers of service—December 23, 2024. *See* Doc. 11; Doc. 12; Doc. 13; Doc. 14. And so, they filed their Motion to Dismiss (Doc. 15) on February 21, 2025—59 days after they returned waivers of service. But that's not how the Rules calculate the deadline. Instead, Fed. R. Civ. P. 4(d)(3) provides that a "defendant who, before being served with process, timely returns a waiver need not serve an answer to the complaint until 60 days after the request was sent[.]" The docket reveals that the Clerk issued

the waiver requests on October 9, 2024. So, under Rule 4(d)(3), defendants had until early December to serve an answer or otherwise respond once they waived service. Clearly, a motion to dismiss filed on February 21, 2025, doesn't meet that deadline. As already acknowledged, service and timeliness issues abound.[5]

But the court concludes these issues don't merit a default judgment because "the law dislikes judgments by default[.]" 10A *Wright & Miller's Federal Practice & Procedure* § 2686 (4th ed. May 2025 Update); *see also Polaski v. Colo. Dep't of Transp.*, 198 F. App'x 684, 685 (10th Cir. 2006) ("Default judgments are disfavored by courts."). And "courts generally would prefer to deny" a default judgment motion in favor of deciding the case on its merits. *Wright & Miller's Federal Practice & Procedure* § 2686; *see also Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970) ("The preferred disposition of any case is upon its merits and not by default judgment."). Because defaults are disfavored, "any doubts usually will be resolved in favor of the defaulting party." *Wright & Miller's Federal Practice & Procedure* § 2681. What's more, policy "weighs heavily in favor of trial on the merits and against default judgments in cases"—like this one—"calling into question the constitutionality of a state statute or raising other significant public issues." *Id.* (footnote omitted). As a final nail in the default judgment coffin, defendants accurately assert that Mr. Ryan failed to follow the requisite procedures for a

---

[5] The court recognized yet another service issue when digging into the docket. Apparently, defendant Judge Gossard never returned a waiver of service alongside the other defendants here. Nor did the court ever serve him. But Judge Gossard joined the filing of the Motion to Dismiss (Doc. 15) at issue here. And "a defendant can waive such defenses to a complaint as lack of personal jurisdiction, lack of proper service of process, and lack of proper process, by declining to raise them in a responsive pleading or by making an appearance." *Walton v. Lea Cnty. Det. Ctr.*, No. CIV 21-0466 JB/GJF, 2024 WL 2804692, at *19 (D.N.M. May 31, 2024). So, to the extent dismissing Judge Gossard under Rule 12(b)(6) absent service raises concerns, the issue's waived.

default judgment under Rule 55. Namely, he never applied to the Clerk for an entry of default before his motion to the court. *See* Fed. R. Civ. P 55(a). The court thus denies Mr. Ryan's Motion for Default Judgment (Doc. 17).

**VII.     Conclusion**

The court dismisses the Honorable Judge Gossard as a defendant on judicial-immunity grounds. The court also dismisses, for failure to state a claim, all but one of Mr. Ryan's claims. A procedural-due-process claim premised on returning Mr. Ryan to secure confinement by showing solely a rule violation survives. And the court denies Mr. Ryan's Motion for Default Judgment (Doc. 17).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants David Davies, Laura Howard, Dr. Christine Mohr, Todd Mantel, and the Honorable Judge Gossard's Motion to Dismiss (Doc. 15) is granted in part and denied in part, as fully explained in this Order. Judge Gossard is dismissed on judicial-immunity grounds. So, the court directs the Clerk of the Court to terminate Judge Gossard as a defendant.

**IT IS FURTHER ORDERED THAT** plaintiff Lonnie J. Ryan Jr.'s Motion for Default Judgment (Doc. 17) is denied.

**IT IS SO ORDERED.**

**Dated this 26th day of September, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**