IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LONNIE J. RYAN, JR.,

                        Plaintiff,                    Case No. 24-3154-DDC-GEB

v.

DAVID DAVIES, et al.,

                        Defendants.

## MEMORANDUM AND ORDER

For a second time, this case comes before the court on a motion to dismiss. The court

granted in part and denied in part an earlier dismissal motion filed by all defendants except Sean

Osborn. Doc. 45. Now, Mr. Osborn likewise asks the court to dismiss pro se plaintiff Lonnie J.

Ryan, Jr.'s claims.[1] Doc. 37. Mr. Osborn also asks the court to set aside a Clerk's Entry of

Default against him. Doc. 33. And there are two other pending motions, both filed by plaintiff.

They intertwine with the court's motion-to-dismiss conclusions. So, this Order rules those

motions, as well.

The court conducts its work here in the following order. *First*, it outlines the facts

governing the Motion to Dismiss. *Second*, it takes up Mr. Osborn's Motion to Set Aside (Doc.

33). *Then*, it addresses Mr. Osborn's Motion to Dismiss (Doc. 37). *Finally*, the court rules two

---

[1]    Plaintiff proceeds pro se. The court construes his filings liberally and holds them to a less
stringent standard than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520–21
(1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the court doesn't assume the role of
advocate for the pro se litigant. *Hall*, 935 F.2d at 1110.

other pending motions filed by plaintiff.  When all this work is complete, it produces this bottom line:  Mr. Osborn's entry of default is set aside and just one of plaintiff's claims survives.

## I.    Factual Background

The following facts come from the Complaint (Doc. 1) and from judicially noticed court documents attached to Mr. Osborn's Motion to Dismiss.[2]  The court accepts plaintiff's "well-pleaded facts as true, view[s] them in the light most favorable to [him], and draw[s] all reasonable inferences from the facts in" his favor.  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).  But "factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true."  *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (quotation cleaned up).

### *Plaintiff's Commitment under the KSVPA*

In 1999, plaintiff was charged with and convicted of taking indecent liberties with a minor and sentenced to 52 months in prison.  Doc. 1 at 4 (Compl. ¶ C.2.A).  After serving his criminal sentence, the State of Kansas moved to commit plaintiff under the Kansas Sexually Violent Predators Act (KSVPA).  *Id.* (Compl. ¶ C.2.B).  The Montgomery County, Kansas District Court found plaintiff suffered from pedophilia—a mental abnormality— in 2002 and committed him under the KSVPA.  *Id.* (Compl. ¶ C.2.C).

### *Plaintiff's Transitional Release*

---

[2]    When considering Mr. Osborn's motion, the court can consider documents subject to judicial notice.  Mr. Osborn attaches state court documents to his supporting Memorandum (Doc. 38).  Though it evaluates material outside the Complaint, the court properly can take judicial notice of these proceedings without converting the motion to dismiss into one seeking summary judgment.  *See Bruce v. City and County of Denver*, 57 F.4th 738, 741 n.3 (10th Cir. 2023) ("In ruling on a motion to dismiss, a federal court may take judicial notice of another court's publicly filed records if they have a direct relation to matters at issue."); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.").  The court thus judicially notices Docs. 38-1, 38-2, 38-3, 38-4, 38-6, 38-6, 38-7, 38-8.  Plaintiff never disputes the accuracy or authenticity of these documents.  *See generally* Doc. 41.

In July 2020, the Montgomery County Court moved plaintiff to transitional release.  *Id.* at 5 (Compl. ¶ C.2.G).  The Complaint and the judicially noticed state court documents recount that move differently, however.  According to the Complaint, the Montgomery County Court found plaintiff's "mental abnormality or personality disorder reduced or . . . eliminated to the point that Mr. Ryan was safe to be released."  *Id.* (Compl. ¶ C.2.H).  But the undisputed court documents suggest a more nuanced holding.  For starters, the state's Response to plaintiff's transitional-release petition expressed reservations.  It clarified that the Progress Review Panel considered plaintiff "not completely free of risk due to the nature of his mental abnormality/personality disorder."  Doc. 38-3 at 2 (Def. Ex. C).  Instead, the reviewers characterized his mental abnormality as "significantly mitigated so he appear[ed] safe *to be placed on Transitional Release*."  *Id.* (emphasis added).  And Montgomery County, Kansas District Court Judge Jeffrey D. Gossard similarly qualified his conclusion with limiting language.  He explained that the court was "convinced beyond reasonable doubt that [plaintiff's] mental abnormality or personality disorder ha[d] so changed that [plaintiff was] safe *to be placed in transitional release*."  Doc. 38-4 at 5 (Def. Ex. D) (emphasis added).  In sum, no state court document suggested Mr. Ryan "was safe to be released" fully, as the Complaint alleges.  Doc. 1 at 5 (Compl. ¶ C.2.H); *see generally* Doc. 38-3 (Def. Ex. C).

### *Plaintiff's Conditional Release*

In December 2021, Judge Gossard placed plaintiff on conditional release.  Doc. 1 at 5 (Compl. ¶ C.2.J).  Once again, the Complaint and the attached state court documents employ different language to justify that conditional release placement.  The Complaint asserts that the "Montgomery County Court found beyond a reasonable doubt that Lonnie J. Ryan Jr's mental abnormality or personality disorder [was] reduced or was eliminated to the point that Mr. Ryan was safe to be released."  *Id.* (Compl. ¶ C.2.K).  But the state court recited the findings a bit

3

differently, qualifying plaintiff's "safe" status with limiting language. It explained that the review panel had concluded that plaintiff's "mental abnormality or personality disorder ha[d] changed sufficiently so that it would be *safe to be placed in Conditional Release*." Doc. 38-5 at 2 (Def. Ex. E) (emphasis added). The state court, for its part, simply held that it was "convinced beyond a reasonable doubt that [plaintiff was] appropriate for Conditional Release and determine[d] that [plaintiff] should be placed on Conditional Release." *Id.* at 2–3. At no time did the court declare plaintiff safe for full discharge or unconditional release. *See generally id.*

### *Violation and Return to Secure Confinement Facility*

As part of his conditional release, plaintiff signed a Conditional Release Agreement. It outlined the terms and conditions of his conditional release plan. Doc. 38-6 (Def. Ex. F). In April 2024, plaintiff's conditional release monitor reported by sworn affidavit to the state court that plaintiff "ha[d] violated material conditions of [his] treatment plan[.]" Doc. 38-7 at 2–3 (Def. Ex. G). So, Judge Gossard issued an emergency ex parte order authorizing law enforcement to take plaintiff into custody and return him to the secure commitment facility at Larned State Hospital. *Id.* On April 26, 2024, Mr. Ryan was returned to the secure confinement facility. Doc. 1 at 5 (Compl. ¶ C.2.M).

After his return, the Montgomery County Court convened a hearing about plaintiff's status on May 30, 2024. *Id.* at 6 (Compl. ¶ C.2.Q); Doc. 38-8 at 2–3 (Def. Ex. H). At the hearing, plaintiff stipulated that he had violated specified rules of his Conditional Release Agreement. Doc. 38-8 at 3 (Def. Ex. H). Specifically, he stipulated that "he [had] engaged in sexual activities with two individuals who were peers in the Sexual Predator Treatment Program and members of his support group[.]" *Id.* He also stipulated that he had "failed to disclose the nature of the relations to the Conditional Release Monitor, therapist or any other member of his treatment team . . . until he was confronted." *Id.*

4

According to the Complaint, Judge Gossard then "found that Mr. Ryan should be confined for the rule violation." Doc. 1 at 6 (Compl. ¶ C.2.R). Again, though, the court documents reveal a more nuanced holding:

> The Court finds that the Sexual Predator Treatment Program is progressive by design with skills learned, then demonstrated in behavior. [Plaintiff], while engaging in sexual acts, failing to disclose his behavior and relationships indicate[d] the absence of skills [he] needs to be safe in the community. [Plaintiff] has shown that[,] while engaging in behavior that violates the conditions of his release[,] he was dishonest with his Conditional Release Monitor and therapist, which indicates his lack of interest in therapy, lack of desire to be successful, and lack of remorse for his behavior and dishonesty. These factors along with the results of the actuarial instrument indicate [plaintiff] poses a high degree of risk in the community. The Court finds that it is in the best interests of [plaintiff] and the community that he be returned to the secure care facility, to gain the skills needed to live safely in the community.

Doc. 38-8 at 3 (Def. Ex. H). Based on these findings, Judge Gossard ordered plaintiff returned to the secure commitment facility at Larned State Hospital. *Id.* at 3–4.

Before the court applies the law to these facts to decide whether plaintiff's claims warrant dismissal—as Mr. Osborn argues—it must first determine Mr. Osborn's default status. It turns to that task, next.

## II.    Motion for Default Judgment (Doc. 32) and Motion to Set Aside Clerk's Entry of Default (Doc. 33)

The docket reflects that Mr. Osborn received service of summons and the Complaint on March 31, 2025. Doc. 26. But Mr. Osborn failed to answer or otherwise respond. So, on July 21, 2025, plaintiff filed an Application for a Clerk's Entry of Default against Mr. Osborn. Doc. 30. The court granted it the next day. Doc. 31. A couple weeks later, plaintiff moved for a default judgment against Mr. Osborn. Doc. 32. But then, Mr. Osborn filed a Motion to Set Aside Clerk's Entry of Default. Doc. 33. The court considers the merits of that Motion to Set Aside (Doc. 33), below.

The "law dislikes judgments by default[.]"  10A *Wright & Miller's Federal Practice & Procedure* § 2686 (4th ed. 2025); *see also Polaski v. Colo. Dep't of Transp.*, 198 F. App'x 684, 685 (10th Cir. 2006) ("Default judgments are disfavored by courts.").  And "courts generally would prefer to deny" a default judgment motion in favor of deciding the case on its merits. *Wright & Miller's Federal Practice & Procedure* § 2686; *see also Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970) ("The preferred disposition of any case is upon its merits and not by default judgment.").  Because defaults are disfavored, "any doubts usually will be resolved in favor of the defaulting party." *Wright & Miller's Federal Practice & Procedure* § 2681.  What's more, policy "weighs heavily in favor of trial on the merits and against default judgments in cases"—like this one—"calling into question the constitutionality of a state statute or raising other significant public issues." *Id.* (footnote omitted).

Under Federal Rule of Civil Procedure 55(c), the court needs "good cause" to set aside an entry of default.  Fed. R. Civ. P. 55(c).  This standard is a "fairly liberal" one. *James v. XPO Logistics Freight, Inc.*, No. 19-2390-HLT-ADM, 2020 WL 4569154, at *2 (D. Kan. Aug. 7, 2020).  The court must strike a balance between the "defendant's interest in adjudicating the case on the merits" and "'the interest of the public and the court in the orderly and timely administration of justice.'" *Id.* (quoting *Kiewel v. Balabanov*, No. 10-2113-JTM, 2011 WL 1770084, at *2 (D. Kan. May 9, 2011)).  To decide whether good cause exists, courts consider a nonexclusive list of factors. *See Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 750 (10th Cir. 2009).  This list includes:  "'whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.'" *Id.* (quoting *Dierschke v. O'Cheskey*, 975 F.2d 181, 183 (5th Cir. 1992)).  "The good cause required by Fed. R. Civ. P. 55(c) for setting aside entry of default poses a lesser standard for the

defaulting party than the excusable neglect which must be shown for relief from judgment under Fed. R. Civ. P. 60(b)." *Id.* (quotation cleaned up). The court addresses these factors one-by-one and, in the end, concludes that Mr. Osborn has shown sufficient good cause to set aside the Clerk's Entry of Default (Doc. 31).

### A.    Willful

*First*, consider the willful-conduct factor. "A defendant's knowledge of a lawsuit and his postservice actions play a role in measuring the willfulness of a defendant's default." *James*, 2020 WL 4569154, at *2 (quotation cleaned up). And the "court should consider whether the defendant was trying to stall litigation or was purposefully disregarding the authority of the court." *Perez v. Dhanani*, No. 13-1020-RDR, 2015 WL 437769, at *2 (D. Kan. Feb. 3, 2015). Our court has concluded that "inadvertently set[ting] aside" served papers, such that they aren't subject to the "company's normal practice[,]" counsels against a finding of willfulness. *James*, 2020 WL 4569154, at *3; *see also Fed. Ins. Co. v. TAT Techs.*, No. 16-2755-JWL, 2017 WL 11446208, at *1 (D. Kan. Sept. 28, 2017) (concluding defendant didn't seem "especially culpable" where the proof of service didn't indicate who signed the receipt and "documents were not routed properly to the responsible people"). Willfulness is also unlikely where defendant— upon learning of the suit—swiftly acts to retain counsel and engage in the proceedings. *See James*, 2020 WL 4569154, at *3.

Here, the court finds, Mr. Osborn didn't act willfully in failing to meet his response deadline. As in *James* and *TAT Technologies*, the served documents didn't make it to the responsible people—due to a series of unfortunate events. Mr. Osborn received service of plaintiff's Complaint by certified mail on March 31, 2025. Doc. 34-1 at 1 (Osborn Aff. ¶ 3); Doc. 26. Then, the unfortunate events ensued. *First*, Mr. Osborn confused the present lawsuit

7

with another lawsuit involving his work as a social worker at Larned State Hospital.  Doc. 34-1 at 1 (Osborn Aff. ¶¶ 1–2, 4).  *Then*, he passed the papers on to his supervisor, who was supposed to contact the insurance company who would defend against the suit.  *Id.* (Osborn Aff. ¶ 5).  But his supervisor was out of the office on medical leave.  *Id.*  So, the papers didn't get transferred to the insurance company as Mr. Osborn had anticipated they would.  *Id.*  Indeed, due to a medical leave and oversight on his supervisor's return, the insurance intake department didn't receive the served papers until July 24, 2025.  *Id.* at 2 (Osborn Aff. ¶ 9).  *Finally*, Mr. Osborn later discovered that his supervisor hadn't received any communication from the insurance company about the case because it had gone to an incorrect email address.  *Id.* (Osborn Aff. ¶ 8); Doc. 34 at 6.  This confluence of mishaps left Mr. Osborn unaware of his default status until co-defendants' counsel informed him on July 21, 2025, which set things in motion.  Doc. 34-1 at 1 (Osborn Aff. ¶ 6).  The insurance company received the papers on July 24, 2025 and then provided Mr. Osborn with counsel on August 6, 2025.  *Id.* at 2 (Osborn Aff. ¶ 11).  Counsel filed a Motion to Set Aside Clerk's Entry of Default (Doc. 33) on August 13, 2025.

Plaintiff argues that these facts demonstrate "carelessness" on Mr. Osborn's part.  Doc. 41 at 2.  And that carelessness precludes a finding of good cause, he contends.  *Id.*  So, plaintiff asserts, the court shouldn't set aside the default entry.  *Id.*  To be sure, Mr. Osborn could have attended to matters more closely.  It's prudent to follow up with a supervisor or an insurance company who's responsible for addressing a lawsuit on one's behalf.  But nothing suggests that Mr. Osborn "was trying to stall litigation or was purposefully disregarding the authority of the court."  *Perez*, 2015 WL 437769, at *2.  Mr. Osborn assumed others were handling the matter.  Then, Mr. Osborn took swift action once he realized there was a problem, securing counsel within a few weeks and filing a motion shortly thereafter.  Such swift action "does not

8

demonstrate purposeful disregard for the court's authority." *James*, 2020 WL 4569154, at *3; *Cannon v. SFM, LLC*, No. 18-2364-JWL, 2018 WL 5791614, at *2 (D. Kan. Nov. 5, 2018) (finding no willfulness where "counsel promptly reached out to plaintiff's counsel and this court to fix the mistake"). The willfulness factor thus favors a finding of good cause.

### B.      Prejudice

*Next*, consider prejudice to plaintiff. In this context, prejudice refers to "'acts done by the moving party or events that have occurred which have in some way impaired or thwarted the non-moving party's ability to litigate or defend the case.'" *Kiewel*, 2011 WL 1770084, at *4 (quoting *McCook v. Flex Fin. Holding Co.*, No. 08-2039-CM-GLR, 2008 WL 1924129, at *2 (D. Kan. Apr. 29, 2008)). Mr. Osborn advances two reasons why plaintiff wasn't prejudiced. *First*, the short delay between entry of clerk's default and Mr. Osborn's motion to set aside that entry is insufficient to show prejudice. Doc. 34 at 7. And, *second*, the "case has been pending for months with no significant activity[.]" *Id.* Plaintiff's Response never identifies any prejudice he has experienced from Mr. Osborn's delay. *See generally* Doc. 41.

Our court has found good cause to set aside a default where a plaintiff doesn't allege prejudice and the case is in the early stages. *See TAT Technologies*, 2017 WL 11446208, at *2 (finding no prejudice where plaintiff didn't argue prejudice and wouldn't "suffer from the delay in the litigation of its claims"); *McCook*, 2008 WL 1924129, at *2 (finding no prejudice where plaintiff didn't identify any, little discovery was exchanged, and few case deadlines had passed). This case is still in its early stages. And less than 30 days elapsed between entry of the clerk's default and Mr. Osborn's motion to set it aside. Doc. 31 (Clerk's Entry of Default entered July 22, 2025); Doc. 33 (Motion to Set Aside filed August 13, 2025). In sum, the court "can see no reason why Plaintiff would suffer any prejudice from setting aside the entry of default." *King of*

9

*Freight LLC v. Viva Express, Inc.*, No. 22-1187-EFM-TJJ, 2022 WL 17555397, at *2 (D. Kan. Dec. 9, 2022). So, the second factor likewise favors a finding of good cause.

### C.    Meritorious Defense

The last factor asks whether Mr. Osborn has a meritorious defense. Like the good cause standard as a whole, "the burden to show a meritorious defense is light." *Kiewel*, 2011 WL 1770084, at *4 (quotation cleaned up). A defendant needn't show "a likelihood of success on the merits." *Crutcher v. Coleman*, 205 F.R.D. 581, 585 (D. Kan. 2001). Instead, a defendant's motion "need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Id.*

Mr. Osborn has discharged his burden here. For example, Mr. Osborn argues—in part—that "plaintiff's facts are demonstrably false in view of public records." Doc. 38 at 8 (quotation cleaned up). To support this argument, he explains that no court ever has found plaintiff safe and appropriate for final release. *Id.* at 10. But some of plaintiff's requests for relief turn on the state court having deemed him safe. *See, e.g.*, Doc. 1 at 8 (Compl. ¶ E.1.5) ("Declare that on or about July 2020, when the Montgomery County Court found beyond a reasonable doubt that Mr. Ryan was no longer a danger, it was unconstitutional to continue confinement under the KSVPA."). Where Mr. Osborn argues that some of plaintiff's claims rest on challenged facts, he has shouldered his burden. *See Adams v. Keystone Props., Inc.*, No. 14-1409-JTM-KGG, 2015 WL 1646407, at *3 (D. Kan. Apr. 14, 2015) (finding "defendant's assertion [meets] the minimal standard" where defendant challenged the facts on which plaintiff's claims turned).

In short, this situation isn't one where defendant is "essentially unresponsive[.]" *In re Rains*, 946 F.2d 731, 732 (10th Cir. 1991) (quotation cleaned up) (recognizing that default judgments normally are "available only when the adversary process has been halted because of

10

an essentially unresponsive party" (quotation cleaned up)).  Mr. Osborn didn't act willfully.

Setting aside the default wouldn't prejudice plaintiff.  And Mr. Osborn has asserted meritorious

defenses.  The court thus finds Mr. Osborn has shown good cause, grants Mr. Osborn's motion

(Doc. 33), and sets aside the Clerk's Entry of Default (Doc. 31).  The court also denies plaintiff's

Motion for Default Judgment (Doc. 32).  Given the analysis above, the court will take the

preferred course and decide the case on its merits.  And it turns to those merits—and Mr.

Osborn's dismissal motion—next.

### III.      Motion to Dismiss (Doc. 37)

Mr. Osborn's Motion to Dismiss (Doc. 37) identifies three reasons purportedly

warranting dismissal:  the Complaint doesn't satisfy the pleading requirements under Federal

Rules of Civil Procedure 8 and 9; Mr. Osborn's entitled to qualified immunity; and the

Complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *Id.* at 1–2.  The

court's earlier Order already provided a fulsome analysis of Mr. Osborn's 12(b)(6) arguments.

So, the court incorporates by reference its earlier Order (Doc. 45).  And it explains in an

abbreviated fashion the conclusions it already reached.  But first, the court addresses Mr.

Osborn's pleading requirement and qualified-immunity arguments.

#### A.      Federal Rules of Civil Procedure 8 & 9

Mr. Osborn first argues that the Complaint fails to satisfy the pleading standards

established in Federal Rules of Civil Procedure 8 and 9.  Doc. 38 at 6–7.  He contends that the

Complaint fails to provide notice to Mr. Osborn of the claims against him.  *Id.* at 7.  And he

characterizes plaintiff's filing as a "'kitchen-sink' style Complaint consist[ing] solely of

rambling, disorganized legal conclusions and a smattering of factual allegations[.]"  *Id.* at 8.  The

court disagrees.

11

Under Rule 8, plaintiffs must "state their claims intelligibly" and thus "inform the defendants of the legal claims being asserted." *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007). Complaints run afoul of Rule 8 when they're "'written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs[.]'" *Id.* (quoting *McHenry v. Renne*, 84 F.3d 1172, 1180 (9th Cir. 1996)). Rule 8 doesn't require plaintiff to plead "'detailed factual allegations'" to survive at the motion to dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff needs only plead "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). The Complaint here hits that mark.

The Complaint alleges, for example, that plaintiff's return to secure confinement for breaking a release rule violated his Fourteenth Amendment due-process rights because the return "occurred prior to any finding of the return of a mental abnormality or personality disorder that made him likely to commit another sexually violent offense." Doc. 1 at 5 (Compl. ¶¶ C.2.M, N). And it identifies Mr. Osborn as "a therapist under the KSVPA" who, "acting on behalf of the State of Kansas, . . . confined Mr. Ryan for a rule violation." *Id.* at 2 (Compl. ¶ A.7). So, it identifies the alleged wrong committed and Mr. Osborn's alleged role in it. This satisfies the pleading standard required by Rule 8.

Mr. Osborn also invokes Rule 9 to argue for dismissal. He contends that plaintiff's Complaint doesn't satisfy "Rule 9's heightened requirement of pleading with particularity." Doc. 38 at 8. And he asserts that the Complaint doesn't distinguish "what acts are attributable to whom," making it "impossible for Mr. Osborn to ascertain what particular unconstitutional acts he is alleged to have committed." *Id.* at 6.

12

Rule 9 explains what's required for pleading special matters.  Fed. R. Civ. P. 9.  So, when alleging fraud or mistake, "a party must state with particularity the circumstances constituting the fraud[.]"  Fed. R. Civ. P. 9(b).  But this heightened standard doesn't apply when a plaintiff premises his allegations on a wrong other than fraud.  *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("[T]he case at bar is not premised on fraud and does not trigger Rule 9(b) scrutiny."); *Summit Elec. Supply Co. v. Int'l Bus. Machs. Corp.*, No. 07-0431 MCA/DJS, 2008 WL 11451895, at *2 (D.N.M. Mar. 31, 2008) ("Rule 9(b)'s particularity requirement applies only to claims that are premised on fraud.").  Plaintiff here doesn't allege fraud or mistake, so Rule 9 provides no basis for dismissal.

Although Rule 9 doesn't apply, Mr. Osborn's particularity argument isn't completely off-base.  Some § 1983 claims require greater particularity to identify a defendant's personal participation.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) ("In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities.  Therefore it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." (emphasis omitted)).  But this special need for particularity stems from individual-capacity claims and doesn't inhere when a plaintiff alleges just official-capacity claims.  *See Miskovsky v. Jon*es, 559 F. App'x 673, 676 (10th Cir. 2014) (affirming and agreeing fully where district court relegated personal-participation requirement to individual-capacity claims); *Spiess v. Fricke*, 386 F. Supp. 2d 1178, 1191 (D. Kan. 2005) ("[Defendant's] lack of personal involvement in any retaliation is irrelevant because this is an official capacity claim essentially against the State."); *Clark v. Bartling*, No. CIV-08-05-C, 2009

13

WL 112985, at *7 (W.D. Okla. Jan. 15, 2009) ("[Defendant's] lack of personal participation would not affect the official capacity claim."); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). All of plaintiff's claims here assert purely official-capacity claims. Doc. 41 at 5 (clarifying that plaintiff brings "'official capacity' claim[s] seeking declaratory and injunctive relief"). So, any lack of individual particularity in pleading doesn't require dismissal. The court thus denies Mr. Osborn's motion to the extent it premises dismissal on Rules 8 and 9.

### B.      Qualified Immunity

Plaintiff's choice to restrict his claims to official-capacity claims also has implications for Mr. Osborn's next line of argument. Mr. Osborn contends he's entitled to qualified immunity. Doc. 38 at 12. In so doing, he explains that a "state official sued in her individual capacity is entitled to qualified immunity[.]" *Id.* But plaintiff doesn't assert any individual-capacity claims. Instead, he clarifies—explicitly—that he asserts only official-capacity claims. Doc. 41 at 5. And qualified immunity doesn't apply to official-capacity claims. *See Cox v. Glanz*, 800 F.3d 1231, 1239 n.1 (10th Cir. 2015) ("The defense of qualified immunity is available only in suits against officials sued in their personal capacities, not in suits against officials sued in their official capacities." (quotation cleaned up)). So, qualified immunity doesn't preclude suit against Mr. Osborn. And the court thus denies Mr. Osborn's motion where it argues for dismissal on qualified-immunity grounds.

### C.      Failure to State a Claim

Finally, Mr. Osborn argues that plaintiff fails to state a claim against him because plaintiff bases his requests for relief on factually unsupported allegations. Doc. 38 at 8. Specifically, he challenges claims premised on two allegations: plaintiff's allegation that his return to secure confinement was punitive and plaintiff's allegation that the state court found that

14

plaintiff no longer presented a danger. *Id.* Mr. Osborn also contends that the Complaint doesn't allege the requisite facts to support an equal protection violation. *Id.* at 16.

The court already has addressed these arguments in its earlier Order ruling the other defendants' dismissal motion. And those conclusions apply with equal force to Mr. Osborn. The court thus doesn't repeat its full dismissal analysis here. Instead, it briefly summarizes that Order's conclusions, below, and refers readers interested in the full analysis to its earlier Order (Doc. 45).

There, the court concluded that most, but not all, of plaintiff's constitutional claims fail as factually unsupported. Doc. 45 at 14. *First*, it explained that the judicially noticed court documents demonstrate that plaintiff's return to Larned State Hospital wasn't punitive. *Id.* at 16–17. Those court documents clarify that his return didn't serve to exact retribution or deter future violations. *Id.* Instead, it served to hold him until he's no longer a threat. *Id.* And the United States Supreme Court has held such a purpose constitutionally permissible and nonpunitive in nature. *Id.* at 15–17 (citing *Kansas v. Hendricks*, 521 U.S. 346, 361–69 (1997)). So, any claims predicated on plaintiff's assertion that his return to secure confinement was punitive fail as factually unsupported and as unfounded under *Hendricks*.

*Second*, the court agreed with defendants (and now with Mr. Osborn, as well) that no court ever has deemed plaintiff safe or no longer a danger. *Id.* at 19–20. Instead, the judicially noticed court documents reveal that the state court found plaintiff fit for transitional or conditional release—not full release. *Id.* That is, all findings that plaintiff was "safe" were qualified by phrases like "safe to be placed" in transitional or conditional release. *Id.* at 20 (citing various state court documents). So, plaintiff's constitutional claims premised on the court having deemed him "no longer a danger" fail as unsupported by judicial records. *Id.* at 20–21.

The court also addressed, separately, plaintiff's assertion that his continued confinement under the KSVPA is unconstitutional.  This attack appears to challenge the fact of his confinement—a challenge appropriate under a habeas action but not on a § 1983 claim.  *Id.* at 21 (citing, among others, *Boutwell v. Keating*, 399 F.3d 1203, 1209 (10th Cir. 2005)).  So, plaintiff's claims premised on a "no-longer-a-danger theory" fail, too.

*Third*, the court concluded that it also must dismiss plaintiff's equal protection claim.  *Id.* at 12–13.  Plaintiff never alleges that he's a member of suspect class, nor does the Tenth Circuit recognize sex offenders as a suspect class.  *Id.* at 12 (citing *Hines v. Addison*, 117 F. App'x 713, 715 (10th Cir. 2004)).  And the Complaint never identifies similarly situated individuals or differential treatment to support a class-of-one equal protection theory.  *Id.* at 12–13.  So, plaintiff's equal protection claim likewise falters.[3]

The court thus grants Mr. Osborn's dismissal motion for claims that rely on these three theories:  punitive return, no-longer-a-danger finding, and equal protection.  In doing so, the court adopts and incorporates the reasoning of its earlier Order.  Doc. 45.  That Order also held that one procedural-due-process claim survives.  *Id.* at 21–24.  And here, on this motion, Mr. Osborn presents no arguments that would warrant a different conclusion.  *See generally* Doc. 38.  In short, the court construed one of plaintiff's claims to challenge whether the state can employ a rule violation as a proxy for a renewed finding of mental abnormality.  Doc. 45 at 22.  While the state court determined that plaintiff's rule violation demonstrated dangerousness, a finding of dangerousness alone doesn't suffice to justify commitment.  *Id.* at 23 (citing *Hendricks*, 521 U.S. at 358).  Proof of some additional factor—like mental abnormality—is necessary.  *Id.*  So, the

---

[3]    Plaintiff asks the court to reconsider this equal protection conclusion in his Motion for Reconsideration (Doc. 46).  The court addresses that motion at the end of this Order.  *See* § IV.A.

16

court concluded plaintiff's procedural-due-process claim challenging what the state must show to demote an individual who violates a release rule was viable. *Id.* at 21–24. The same claim survives Mr. Osborn's Motion to Dismiss (Doc. 37).

**IV.      Motion to Reconsider (Doc. 46) & Motion to Clarify (Doc. 47)**

The court completes its current assignments by addressing two motions filed by plaintiff after the court's earlier Order. Plaintiff filed a reconsideration motion and a clarification motion. The court takes up each one, in turn.

**A.      Motion for Reconsideration (Doc. 46)**

In his Motion for Reconsideration (Doc. 46), plaintiff argues that the court should reconsider dismissing his equal protection claim. *Id.* at 1. He contends that, in a Memorandum of Law (Doc. 2) contemporaneously filed with his Complaint, he identified that he is similarly situated to—but treated differently than—criminal prisoners in Kansas. Doc. 46 at 2–3. And he asserts that defendants[4] failed to account for these arguments in their Motion to Dismiss (Doc. 15). Doc. 46 at 2. Defendants respond by noting plaintiff's failure to address—at all—his equal protection claim in his motion-to-dismiss briefing. Doc. 51 at 3. Defendants are right.

Defendants explicitly challenged plaintiff's equal protection claim in their Motion to Dismiss (Doc. 15). They argued that "the Complaint is void of specific facts to support an equal protection allegation." *Id.* at 14. And they asserted that "[a]bsent alleging membership in a specific class or group, [plaintiff] must contend he was treated differently from similarly situated individuals"—and he didn't. *Id.* Plaintiff's Response never addressed defendants' challenge. Indeed, it didn't even mention plaintiff's equal protection claim anywhere, much less identify similarly-situated individuals or differential treatment. *See generally* Doc. 18. Nor did

---

[4]      The court's use of defendants in this section refers to those defendants who were a party to the first Motion to Dismiss (Doc. 15), which includes all surviving defendants except Mr. Osborn.

plaintiff's Response ever cite Doc. 2 or reference plaintiff's Memorandum of Law in any way. *Id.* Where a plaintiff doesn't respond to an argument, the court isn't "required to do his work for him and dissect the [defendants'] plausible argument." *Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015). Instead, the plaintiff "waives, as a practical matter anyway, any objections not obvious to the court[.]" *Id.* (quotation cleaned up) So, the court could deny plaintiff's reconsideration motion based solely on this failure to respond. But that's not the only reason for denial. Even if the court reached the merits, it would deny the motion.

Let's imagine—for the sake of argument—that plaintiff's Response had pointed to his Memorandum of Law and argued he was similarly situated to criminally detained persons. His equal protection claim still would have failed. Here's why. When the Supreme Court reviewed the constitutionality of the KSVPA, it went to great lengths to distinguish KSVPA confinement from criminal punishment. *Hendricks*, 521 U.S. at 361–62. The Court determined that the KSVPA didn't implicate either of criminal punishment's two primary objectives: retribution or deterrence. *Id.* And so, the Court concluded that—while the confinement had a potentially indefinite duration—it wasn't punitive like criminal punishment. *Id.* at 363. That's so because the confined person "is statutorily entitled to immediate release" and "at any time" once he "is adjudged 'safe to be at large[.]'" *Id.* (quoting Kan. Stat. Ann. § 59-29a07).

Such distinctions between the purposes of KSVPA confinement and those of criminal confinement militate against the court finding plaintiff similarly situated to criminally detained persons. These distinctions suggest that confined sexually violent predators and criminal detainees are in "meaningfully dissimilar situations[.]" *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). The Tenth Circuit even has held inmates in the same facility not similarly situated. *See Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018). In *Requena*, two

18

inmates in the same facility both requested use of a phone, but the requests involved two different phones and calls for two different purposes. *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018). Our Circuit found these inmates—both confined for criminal violations in the same facility—not sufficiently "alike in all relevant respects" to qualify as similarly situated for equal protection purposes. *Id.* (quotation cleaned up). So, the fact of confinement alone can't supply the requisite similarity—and even more so here, where the confinement is in different facilities and for expressly different purposes.

Equally convincing, our court already has considered and rejected plaintiff's precise argument. Namely, our court has dismissed a sexually violent predator's equal protection claim predicated on being similarly situated to criminal detainees. *Merryfield v. Turner*, No. 09-3130-SAC, 2010 WL 559730, at *1 (D. Kan. Feb. 16, 2010) (finding plaintiff failed to state an equal protection claim under the Fourteenth Amendment—in part—because, as a sexually violent predator, he was "not similarly-situated with prison inmates"). Both our court and our Circuit consistently have distinguished sexually violent predators from those criminally detained, as well as those civilly committed for other reasons. *See Merryfield v. Jordan*, 584 F.3d 923, 927 (10th Cir. 2009) (finding sexually violent predator not a "prisoner" under the Prison Litigation Reform Act because he was civilly committed "due to a finding that he poses a future danger due to a mental abnormality or personality disorder" and not for criminal violation); *Beyer v. Deslauriers*, No. 17-3002-SAC, 2019 WL 2409603, at *2 (D. Kan. June 7, 2019) ("[A]s a civil committee under the KSVPA, Plaintiff is not a person who is civilly committed only for mental health issues, but neither is he a prisoner."); *Burch v. Jordan*, No. 07-3236, 2010 WL 5391569, at *12 (D. Kan. Dec. 22, 2010), ("[A]s a civil committee under the KSVPA[,] [p]laintiff is not an inmate; nor is he a person who is civilly committed merely for mental health issues. Rather,

plaintiff is committed . . . upon the basis that he is a sexually violent predator from whom society needs to be protected."), *aff'd sub nom., Burch v. Jordan*, 444 F. App'x 236 (10th Cir. 2011). These persistent distinctions kneecap plaintiff's similarly-situated argument.

Plaintiff tries to salvage his equal protection claim by citing *Chubb v. Sullivan*, 330 P.3d 423 (Kan. Ct. App. 2014). Doc. 46 at 2. He contends that the Kansas Court of Appeals, in *Chubb*, "held that an SVP in Kansas is similarly situated to a prisoner in Kansas and the rights of a prisoner set a floor for determining what rights [plaintiff] is entitled to." *Id.* at 2–3. But plaintiff misreads *Chubb*. *Chubb* involved a sexually violent predator's claim that he'd been deprived of a liberty interest when his secure facility prohibited a visit from his brother. 330 P.3d at 426. And so, the Kansas Court of Appeals addressed the conditions at the secure facility preventing the visit. It thus compared the conditions afforded sexually violent predators at their secure facility with the conditions at facilities for criminal detainees and other civilly committed persons. *Id.* at 428. *Chubb* never suggested that sexually violent predators are similarly situated to criminally detained persons. Just the opposite. *Chubb* emphasized the same distinctions outlined in *Hendricks*—drawing boundaries between criminal confinement, KSVPA confinement, and other civilly committed individuals. And it did so in the context of facility conditions—not the release rule violations at issue here. *Chubb* thus explains that persons "'who have been involuntarily committed are entitled to more considerate treatment conditions of confinement than criminals whose conditions of confinement are designed to punish.'" 330 P.3d at 428 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982)). In brief, *Chubb* does nothing to help plaintiff establish the requisite similarly-situated prong of an equal protection claim. Plaintiff's Motion for Reconsideration (Doc. 46) is denied.

**B.     Motion to Clarify (Doc. 47)**

Plaintiff also filed a Motion to Clarify (Doc. 47), asking the court to clarify that his claim for a Fourteenth Amendment violation based on impugning of his good name or character is valid.[5]  Doc. 47 at 1–2.  Defendants respond that this allegation "does not assert an independent violation" but instead "alleges a harm resulting from the constitutional violations he claims." Doc. 50 at 2.

Best the court can tell, plaintiff adopts this impugning language to invoke a doctrine commonly referred to as "stigma plus."  *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004).  A plaintiff asserting a stigma plus claim contends "that the government has violated the Due Process Clause by impugning his or her good name, reputation, honor, or integrity[.]"  *Id.* (quotation cleaned up).  To state such a claim, a plaintiff must show that:

> (1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and (2) the plaintiff experienced some governmentally imposed burden that "significantly altered [his or] her status as a matter of state law."

*Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 710–11 (1976)).  "Damage to one's reputation alone . . . is not enough to implicate due process protections."  *Id.*

Plaintiff's Complaint doesn't allege facts to establish such a claim.  It alleges that his sudden move back to secure confinement caused him to miss work without warning and thus caused him to lose his job.  Doc. 1 at 5 (Compl. ¶ C.2.P).  And the Complaint alleges that plaintiff lost his job and income, he ran into debt problems and thus affected his credit report and lines of credit.  *Id.*  But it never alleges the requisite false statement.  *See generally* Doc. 1.  Nor does it allege that plaintiff asserts the government's rule-violation accusation was false.  *Id.*

---

[5]  Plaintiff's clarification motion also asked the court to clarify whether its earlier Order (Doc. 45) addressed Mr. Osborn's Motion to Dismiss (Doc. 37).  Doc. 47 at 2.  To clarify, it did not.  But this Order does.  To the extent plaintiff's Motion to Clarify (Doc. 47) seeks clarification about Mr. Osborn's dismissal motion, it is granted.

Instead, plaintiff stipulated that he had violated his release conditions.  Doc. 38-8 at 3 (Def. Ex. H).  And while the Complaint alleges that he was fired, that's because he was "a no call at work"—not because of any false statement.  Doc. 1 at 5 (Compl. ¶ C.2.P).  So, the court denies plaintiff's Motion to Clarify (Doc. 47) to the extent it asks that the court to identify this claim as valid.  The court clarifies that no Fourteenth Amendment claim for impugning plaintiff's character or name can proceed on these facts.

## V.        Conclusion

The court concludes that Mr. Osborn's default was neither willful nor would setting it aside prejudice plaintiff.  And it finds that Mr. Osborn presents a meritorious defense.  So, the court sets aside the Clerk's Entry of Default (Doc. 31) against Mr. Osborn and denies plaintiff's default judgment motion.  The court also grants Mr. Osborn's dismissal motion to the extent it requests dismissal of plaintiff's claims premised on the punitive nature of his return to secure confinement; the alleged state-court finding that plaintiff is safe; and equal protection.  It denies Mr. Osborn's motion in all other respects.  One procedural-due-process claim survives.  The court also denies plaintiff's reconsideration motion and grants in part, denies in part plaintiff's clarification motion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Seth Osborn's Motion to Set Aside Clerk's Entry of Default (Doc. 33) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff Lonnie J. Ryan, Jr.'s Motion for Default Judgment (Doc. 32) is denied.

**IT IS FURTHER ORDERED THAT** defendant Seth Osborn's Motion to Dismiss (Doc. 37) is granted in part and denied in part, as set forth in this Order.

**IT IS FURTHER ORDERED THAT** plaintiff Lonnie J. Ryan, Jr.'s Motion for

Reconsideration (Doc. 46) is denied.

**IT IS FURTHER ORDERED THAT** plaintiff Lonnie J. Ryan, Jr.'s Motion to Clarify

(Doc. 47) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 19th day of March, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**